# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **ASSOCIATED PRODUCERS, LTD.,**<br>**110 Spadina Avenue, Suite 1001**<br>**Toronto, Ontario Canada  M5V 2K4,**<br><br>**-and-**<br><br>**SIMCHA JACOBOVICI,**<br>**9 Akiva Street, Unit 7**<br>**Ra'anana, Israel**<br>**43260,**<br><br>      **Plaintiffs,**<br><br>      **v.**<br><br>**VANDERBILT UNIVERSITY,**<br>**305 Kirkland Hall**<br>**Nashville, TN  37204,**<br><br>**- and -**<br><br>**ROBIN M. JENSEN,**<br>**4618 Mountain View Drive**<br>**Nashville, TN  37215,**<br><br>      **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Civil Action No. _____**<br><br>    **DEMAND FOR TRIAL BY JURY** |

_____

### COMPLAINT FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL OR BUSINESS RELATIONS AND OTHER RELIEF

COMES NOW Plaintiffs ASSOCIATED PRODUCERS, LTD., and SIMCHA JACOBOVICI (collectively, "Plaintiffs"), and for causes of action against Defendants VANDERBILT UNIVERSITY and ROBIN M. JENSEN (collectively, "Defendants"), and each of them, allege:

### THE PARTIES

1.     Plaintiff SIMCHA JACOBOVICI ("JACOBOVICI") is an individual who is an

Israeli-Canadian citizen who resides in Ra'anana, Israel.   JACOBOVICI is a noted filmmaker, New York Times best-selling author and professor of religious studies, specializing in biblical archaeology.   He was the host of the History Channel's television series *The Naked Archaeologist*.   JACOBOVICI has won, among his many awards, the Edward R. Murrow Award for journalism, the DuPont Award from the Columbia School of Journalism, and three Emmys for investigative journalism.

2.      Plaintiff ASSOCIATED PRODUCERS, LTD. ("AP") is a multi-award winning independent film production company, whose principal place of business is at 110 Spadina Avenue Suite 1001, Toronto, Ontario Canada.

3.      Defendant VANDERBILT UNIVERSITY ("VANDERBILT") is a Tennessee corporation serving as a private university comprised of several academic and research facilities. VANDERBILT's principal place of business is at 305 Kirkland Hall, Vanderbilt University, Nashville, Tennessee  37204.  VANDERBILT maintains an office in the District of Columbia at 750 First Street, N.E., Suite 1110, Washington, DC 20002   ("VANDERBILT'S OFFICE OF FEDERAL RELATIONS"), which, *inter alia*, advocates on behalf of federal legislation, regulations and policy that could affect VANDERBILT.  According to its website, however:

> Vanderbilt takes an even broader view of Washington, which is the home of so many policymakers and opinion leaders.  Our office works with a wide range of non-governmental organizations, including the large concentration of national news media in Washington, major think tanks, the National Academies, and numerous scientific societies.  In essence, our presence in Washington gives us a "seat at the table" when many important policy issues are being deliberated.

http://www.vanderbilt.edu/federalrelations/aboutus/role.php

4.      Defendant ROBIN M. JENSEN ("JENSEN") resides in Tennessee and at all relevant times was, and is, employed by VANDERBILT as the Luce Chancellor Professor of the History of Christian Art and Worship, teaching courses in both the university's History of Art

department and its Divinity School.

5.      At all times herein mentioned, Defendants, and each of them, were and are the partners, principals, agents, servants, employees, co-conspirators, joint venturers, successors-in-interest, assigns, and/or subsidiaries, each of the other.  Plaintiffs' damages as alleged herein are the result of the acts and/or omissions such Defendants committed and/or omitted in the course and scope of such conspiracy and/or their authority as such partners, principles, agents, servants, employees, joint venturers, successors-in-interest, assigns and/or subsidiaries.  Each of the Defendants is contractually, vicariously, intentionally, negligently, or in some manner legally responsible for the acts and damages herein alleged.

6.      Plaintiffs are informed and believe, and on that basis allege, that at all times herein material, JENSEN conspired with others by entering into an agreement to commit wrongful and tortious acts contained herein and participated in or committed overt acts in furtherance of said conspiracy.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a).  Plaintiffs are seeking damages in excess of $75,000.

8.      This Court has personal jurisdiction over the Defendants because a substantial part of the relevant acts complained of herein occurred in the District of Columbia and this judicial district.  In addition, Vanderbilt maintains an office in the District of Columbia.

9.      Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial portion of the wrongful acts at issue in this case occurred within this judicial district.

## FACTS

10.      In 2010, JACOBOVICI, working with archaeologists and forensic anthropologists

as part of a scientific investigation, explored a previously unexcavated Jesus-era tomb in Jerusalem.

11.     JACOBOVICI co-authored a book of his findings called "THE JESUS DISCOVERY: The New Archaeological Find that Reveals the Birth of Christianity."

12.     JACOBOVICI and AP created a one-hour documentary providing a firsthand account of the findings, entitled "The Resurrection Tomb."

13.     In or around September, 2010, National Geographic commissioned JACOBOVICI and AP for $ 1 million to make an archaeological film concerning the burial cave in Jerusalem (herein "THE CAVE DOCUMENTARY").  National Geographic had planned to broadcast THE CAVE DOCUMENTARY at the beginning of its "Exploration Week" series.

14.     The relationship with National Geographic and the broadcast of THE CAVE DOCUMENTARY would have resulted in economic benefit to AP and JACOBOVICI.

15.     As part of the filming for THE CAVE DOCUMENTARY, Defendant JENSEN appeared as an expert on early Christian art in a section of the documentary.  JACOBOVICI and AP paid for Defendant JENSEN's travel expenses and provided her a per diem.

16.     Upon information and belief, Defendant JENSEN required and received approval from her employer Defendant VANDERBILT before she could take part in the film project.

17.     Upon further information and belief, Defendant VANDERBILT expects and requires that as part of their job duties its professors, such as JENSEN, will not only teach students in the classroom but also promote and raise the visibility of the university through media appearances.  Thus, Defendant JENSEN's curriculum vitae on the university's website prominently mentions Defendant JENSEN's publications as well as appearances in "Film, DVD and Video," including her participation in a BBC television series.

18.     On further information and belief, after obtaining approval from Defendant VANDERBILT and agreeing to appear in THE CAVE DOCUMENTARY as a professor from VANDERBILT, Defendant JENSEN signed a release form with JACOBOVICI and AP, permitting Plaintiffs to display her likeness and affiliation with Defendant VANDERBILT in the documentary.

19.     Defendant VANDERBILT's involvement and approval for said release is evidenced by the fact that when Defendant JENSEN later was attempting to receive a copy of her release she was advised to "get the person running P.R. at Vanderbilt to ask for it as they don't like bad P.R."

20.     Defendant JENSEN also executed a Non-Disclosure Agreement ("NDA") with National Geographic.  Part of the terms of the NDA was that Defendant JENSEN could not discuss THE CAVE DOCUMENTARY with others until after the broadcast of the film.

21.     Defendant JENSEN flew to Rome, Italy on or about January, 2011, where she was filmed by JACOBOVICI and AP in early Christian catacombs, questioned about certain art found in those catacombs, and then presented with an image taken from the burial cave in Jerusalem for her opinion on whether it might represent the biblical story of Jonah and the Whale.

22.     In order to assess the integrity of THE CAVE DOCUMENTARY before it was aired on the National Geographic television channel, National Geographic organized a group of consultants to opine on the viability of THE CAVE DOCUMENTARY as a legitimate historical and archeological work.  Defendant JENSEN was one of the consultants.  She was recommended to the panel by JACOBOVICI, who believed that she was an employee of VANDERBILT.

23.     In or about late May, 2011, the panel held a meeting at National Geographic's headquarters in Washington, D.C.

24.     Those in attendance at the panel's meeting included Defendant JENSEN.

25.     At the panel's meeting, Defendant JENSEN voiced her support for the film being aired, noting that the findings in the documentary may be "very, very important."

26.     Defendant JENSEN's views dramatically changed subsequent to the panel meeting after she became acquainted with an unnamed co-conspirator, who warned that her "academic reputation [is] at stake" if she remained associated with JACOBOVICI.

27.     To that end, the co-conspirator relayed to Defendant JENSEN a litany of unsubstantiated rumors about JACOBOVICI, including, but not limited to, that he was well-known in Israel as "pimping off the Bible" and that other broadcasters (*e.g.*, Fox and BBC) refuse to work with him because of his tarnished reputation.   The co-conspirator informed Defendant JENSEN to "pass" this information "on" to National Geographic.

28.     This co-conspirator stated to Defendant JENSEN that his objective was to "fight" JACOBOVICI "aggressively not in the manner in which we would normally address colleagues with whom we disagree but as individuals who have decided to place fame and fortune before the academic world."   Defendant JENSEN expressed her desire to join in her co-conspirator's "campaign."

29.     Defendant JENSEN thereafter communicated through e-mails and telephone calls to National Geographic company officials and other National Geographic panel members that she had "second thoughts" with THE CAVE DOCUMENTARY being aired.   Defendant JENSEN later admitted to her co-conspirator that the communication of her "second thoughts" had "some good effect" and took "comfort" that "Nat Geo has serious reservations about the

project now and are unlikely to go forward with it."  She further "assur[ed]" her co-conspirator

that National Geographic "is no longer working with Simcha and . . . intends to pull the project."

30.     In these communications, Defendant JENSEN engaged in wrongful conduct

through misrepresentation and defamation by forwarding to National Geographic and other

National Geographic panel members not her own consulting recommendations based on study

and reflection, but instead submitted information that was little more than the litany of

unsubstantiated rumors about JACOBOVICI, which were provided to her by the co-conspirator.

31.     On information and belief, Defendant JENSEN passed on the unsubstantiated

rumors without any attempt to verify them.  Further, she did so after agreeing, and conspiring

with the co-conspirator, that together they would participate in a plan to ruin the career and

general credibility of JACOBOVICI as a producer of documentaries involving controversial

religious and archaeological topics.  In other words, Defendant JENSEN essentially agreed with

her co-conspirator to "put JACOBOVICI and ASSOCIATED PRODUCERS out of business" by

using her position with Defendant VANDERBILT and her voice as a consultant to National

Geographic to achieve that end.

32.     This co-conspirator, who referred to Defendant JENSEN as his "informant," also

solicited Defendant JENSEN's assistance in undermining THE CAVE DOCUMENTARY

project by asking for information from her that he intended to give to others as proof the

documentary should be pulled.

33.     More specifically, this co-conspirator asked for and received e-mails (between

JACOBOVICI and another member of the film project) from Defendant JENSEN that he told her

he intended to use to "go after Simcha, hoping to finish his film career."

34.    The co-conspirator also asked for and received from Defendant JENSEN information concerning the content of THE CAVE DOCUMENTARY notwithstanding the prohibition in the NDA.

35.    Defendant JENSEN's conduct went beyond the deliberate misrepresentations she presented to the National Geographic panel, and included information she relayed to National Geographic officials.   Specifically, Defendant JENSEN sent correspondence to Paul Durbin, Senior Director at National Geographic in charge of the broadcaster's Standards and Practices, with the goal of specifically ensuring that National Geographic would be "no longer working with Simcha."

36.    JACOBOVICI was later contacted by National Geographic's counsel, Michael Beller, and informed that National Geographic did not want to proceed with the project.

37.    Plaintiffs later sold the rights to THE CAVE DOCUMENTARY to The Discovery Channel.  Plaintiffs reminded those involved in the documentary, including Defendant JENSEN, that they were still bound by the terms of the NDA "until the earlier of the press conference [to be held at the film's premiere] or the broadcast of the film."

38.    Defendant JENSEN's conspiracy to end JACOBOVICI's "film career" did not end with National Geographic refusal to broadcast THE CAVE DOCUMENTARY, but continued to prevent the film's airing on The Discovery Channel.

39.    Specifically, after National Geographic pulled its support for the film project, the co-conspirator asked for and received from Defendant JENSEN further disclosures on the contents of the film before it was broadcast with The Discovery Channel or anyone else.

40.    The co-conspirator communicated these further disclosures were needed because "we are planning a press conf. before he has his press conf. and the more info that I can give to

Discovery or  whomever falls for it will have second thoughts well beforehand and they will lose big time."

41.    In total, during the course of the conspiracy, in the process of interfering with Plaintiffs' business relations with National Geographic, Defendant JENSEN revealed the following elements of THE CAVE DOCUMENTARY to her co-conspirator:  (1) That she was filmed "in the catacombs about a third or fourth century Christian pictorial image," (2) disclosed that the catacombs in question were not the ones built atop the "house of Mussolini's mistress," (3) revealed that the film was meant to be about things found in the burial cave concerning Jesus and the resurrection, and (4) passed on that in the film there is discussion of a "mikveh [sic] found near one of the tombs"  which JACOBOVICI "refers to as a baptistery."

42.    Defendant JENSEN's actions irreparably damaged Plaintiffs' pre-existing profitable business relationship with National Geographic.   Prior to THE CAVE DOCUMENTARY, Plaintiffs had worked with National Geographic for other television documentaries, including, but not limited to, a four-part documentary series "Lost Faces of the Bible" and a three-part documentary series "Living in the Time of Jesus."  Since 2010, Plaintiffs have done no work for National Geographic.

43.    Defendant JENSEN's actions also damaged Plaintiffs by delaying the release of the broadcast of THE CAVE DOCUMENTARY so that it could not coincide with the publication of the companion book THE JESUS DISCOVERY: The New Archaeological Find that Reveals the Birth of Christianity.  The result this lack of synchronization had on sales of the companion book was considerable with Plaintiffs realizing no gain from the book beyond receipt of the advance.

44.     In contrast, in 2007 Plaintiffs released a documentary "THE LOST TOMB OF JESUS" on the Discovery Channel.  Contemporaneous with the broadcast of the documentary, Plaintiffs published the book "THE JESUS FAMILY TOMB." The synchronization of the book's release lead to it generating significant income with THE JESUS FAMILY TOMB, reaching number 5 on the New York Times best-sellers list.

45.     Plaintiffs first became aware of Defendant JENSEN's wrongful conduct which was intended to interrupt Plaintiffs' relationship with National Geographic on or about July 16, 2013, when Plaintiffs first discovered a series of email correspondences between Defendant JENSEN and the co-conspirator that included defamation and information regarding a conspiracy to end Plaintiffs' careers.   Until that time, Plaintiffs were unaware that Defendant JENSEN had agreed with the co-conspirator to ruin Plaintiffs' business by submitting false consulting reports and other information to National Geographic.

**COUNT I**
**(Intentional Interference with Prospective Economic Advantage**
**Against Defendants)**

46.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 45 above, as if fully set forth herein.

47.     Plaintiffs had a valid existing contract with National Geographic with respect to THE CAVE DOCUMENTARY.

48.     Plaintiffs had an existing business relationship with National Geographic.

49.     Defendant JENSEN knew of the existing contractual and business relationship between Plaintiffs and National Geographic.

50.     Although Defendant JENSEN agreed to act as a consultant to provide objective, academic consultation to National Geographic, she instead used her consulting position to intentionally destroy Plaintiffs' reputations and to deliberately disrupt the contractual and

business relationship between Plaintiffs and National Geographic so as to prevent National Geographic from broadcasting THE CAVE DOCUMENTARY.

51.     The conduct of Defendant JENSEN as alleged herein was purposeful and intentional and was engaged in for the purpose of depriving Plaintiffs of property or otherwise causing injury, and was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, and was performed with fraud, oppression or malice so as to justify an award of exemplary punitive damages against such Defendants in an amount according to proof at trial.

52.     The conduct of Defendant JENSEN complained of occurred within the scope of her employment with Defendant VANDERBILT, and thus Defendant VANDERBILT is vicariously liable for such conduct.

53.     Plaintiffs have suffered damages of more than $75,000 as a result of said conduct.

**COUNT II**
**(Intentional Interference with Business Relations Against Defendants)**

54.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 53 above, as if fully set forth herein.

55.     Plaintiffs had a valid existing contract with National Geographic with respect to THE CAVE DOCUMENTARY.

56.     Plaintiffs had an existing business relationship with National Geographic.

57.     Defendant JENSEN knew of the existing contractual and business relationship between Plaintiffs and National Geographic.

58.     Although Defendant JENSEN agreed to act as a consultant to provide objective, academic consultation to National Geographic, she instead used her consulting position to intentionally destroy Plaintiffs' reputations and to deliberately disrupt the contractual and

11

business relationship between Plaintiffs and National Geographic so as to prevent National Geographic from broadcasting THE CAVE DOCUMENTARY.

59.     The conduct of Defendant JENSEN as alleged herein was purposeful and intentional and was engaged in for the purpose of depriving Plaintiffs of property or otherwise causing injury, and was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, and was performed with fraud, oppression or malice so as to justify an award of exemplary punitive damages against such Defendants in an amount according to proof at trial.

60.     The conduct of Defendant JENSEN complained of occurred within the scope of her employment with Defendant VANDERBILT, and thus Defendant VANDERBILT is vicariously liable for such conduct.

61.     Plaintiffs have suffered damages of more than $75,000 as a result of said conduct.


WHEREFORE, Plaintiffs pray for judgment against the Defendants, and each of them, as follows:

      a)      For general damages in an amount as may be proved at trial;

      b)      For punitive damages in an amount as may be proved at trial;

      c)      For costs of this lawsuit and reasonable attorneys' fees incurred herein;

      d)      For prejudgment interest according to proof; and

      e)      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of all issues so triable.


Dated:  March 12, 2014                              Respectfully submitted,


                                         /s/ Jackson D. Toof
                                         Jackson D. Toof, Esq. (DC Bar No. 482609)
                                         ARENT FOX LLP
                                         1717 K Street, N.W.
                                         Washington, DC 20036
                                         Tel:    (202) 857-6000
                                         Fax:    (202) 857-6395
                                         Email:  jackson.toof@arentfox.com

                                         *Attorney for Plaintiffs Associated Producers, Ltd.*
                                         *and Simcha Jacobovici*


Of Counsel:

Richard L. Charnley, Esq.
Arent Fox LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
Tel:    (213) 629-7400
Fax:    (213) 629-7401
Email:  richard.charnley@arentfox.com

*Attorney for Plaintiffs Associated Producers, Ltd.*
*and Simcha Jacobovici*